IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:21-CV-188-D

SKYLEE JOHNSON, TAYLER JOHNSON,      )
and SCOTTLYN JOHNSON, minors, by     )
their Guardian ad Litem, LINDSEY     )
JOHNSON, SCOTT JOHNSON,              )
and LINDSEY JOHNSON,                 )
                                     )           **ORDER**
                        Plaintiffs,  )
                                     )
        v.                           )
                                     )
LENDLEASE (US) PUBLIC                )
PARTNERSHIPS LLC, et al.,            )
                                     )
                        Defendants.  )

        On October 27, 2021, Skylee Johnson, Tayler Johnson, and Scottlyn Johnson, by and through

their guardian ad litem Lindsey Johnson, and Scott and Lindsey Johnson (collectively, "the

Johnsons" or "plaintiffs") filed an amended complaint in Onslow County Superior Court against

Lendlease (US) Public Partnerships, LLC ("Lendlease"), Lendlease (US) Public Partnerships

Holdings LLC ("Lendlease Holdings"), AMCC Managing Member LLC, Atlantic Marine Corps

Communities LLC ("AMCC"), AMCC Property Management LLC, WR South LLC, Winn

Management Company LLC, and Winn Management Group LLC (collectively, "defendants") [D.E.

1-1]. On October 29, 2021, defendants removed the case to this court [D.E. 1]. On November 5,

2021, defendants moved to dismiss the amended complaint under Federal Rules of Civil Procedure

12(b)(1), 12(b)(2), and 12(b)(6) and filed a memorandum and exhibits in support [D.E. 12, 13]. On

December 13, 2021, the Johnsons responded in opposition and filed exhibits in support [D.E. 34].

On January 10, 2022, defendants replied [D.E. 44]. As explained below, the court grants in part and

denies in part defendants' motion to dismiss.

I.

The Johnsons are North Carolina citizens who lived at MCB Camp Lejeune from October 2015 through June 2019. See Am. Compl. [D.E. 1-1] ¶¶ 1, 8. All defendants are Delaware or Massachusetts limited liability companies doing business in North Carolina. See id. ¶¶ 10–18. AMCC Managing Member, AMCC, and AMCC Property Management[1] have their principal places of business in Tennessee. See id. ¶¶ 12–3, 14. Lendlease Holdings is the sole member of AMCC Managing Member, which is an indirect subsidiary of an Australian multinational corporation also called Lend Lease. See id. ¶ 12. AMCC Managing Member has a controlling two-thirds interest in AMCC and is the active managing member. See id. ¶ 13; [D.E. 34] 5–6. The U.S. Navy owns a passive one-third interest in AMCC. See Am. Compl. ¶ 13. AMCC Property Management's sole member is Winn Housing Services LLC, which is managed by other Winn entities not parties to this lawsuit. See id. ¶ 15. AMCC Property Management is a division of Winn Management Company. See id. ¶ 16; [D.E. 34-19] ¶ 2.

The Johnsons allege that in 2005, the U.S. Navy selected the multinational Lend Lease to construct and renovate military housing at MCB Camp Lejeune. See Am. Compl. ¶¶ 27–28. The Navy executed a 50-year ground lease with AMCC Managing Member to construct and manage military housing units. See id. ¶¶ 19, 28; [D.E. 34-7] (recorded memorandum summarizing the terms of the ground lease and listing AMCC Managing Member as the lessee). Construction of the

---

[1] AMCC Property Management LLC may be the same entity as Atlantic Marine Corp Communities Property Management. See Am. Compl. ¶¶ 14–16. Defendants appear to treat them as a single entity. See [D.E. 13] 11–12 (referencing only AMCC Property Management and not Atlantic Marine Corp Communities Property Management in a discussion of all defendants). Accordingly, the court assumes both names refer to a single entity and refers to it as AMCC Property Management.

military housing at MCB Camp Lejeune finished sometime between 2013 and 2015. See id. ¶¶ 29, 41. The Johnsons allege that Lendlease did part of the construction, renovation, or demolition work. See id. ¶ 10. The Knox Landing development, into which the Johnsons moved, was one of the last developments completed. See id. ¶ 29. AMCC was formed as part of the operation to "own, lease, manage, acquire, operate, and maintain" the units. Id. ¶ 26; see [D.E. 34-7] 3 (stating the ground lease contemplated AMCC Managing Member "immediately assign[ing] all of its interest, rights, title, liability and obligations" to AMCC). And the Johnsons allege AMCC Property Management and Winn Management Company employed some of the repair and maintenance personnel that worked on the military housing at MCB Camp Lejeune. See Am. Compl. ¶ 18. WR South, which works "in real estate management," allegedly "assisted Winn with regard to MCB Camp Lejeune." Id. ¶ 17 (quotation omitted).

First Sergeant Scott Johnson is a career member of the U.S. Marine Corps. See id. ¶ 39. On October 23, 2015, Johnson executed a lease to rent a duplex at 7061 Omaha Road, Tarawa Terrace, North Carolina. See id. ¶ 31. The duplex is in the Knox Landing development, and the Johnsons were the first family in the duplex. See id. ¶¶ 29, 41. The Johnsons paid rent for the duplex "equal to the Basic Allowance for Military Housing at the 'with dependent' rate (the 'BAH') at the Resident's duty station of the pay grade of the Resident Service Member." Id. ¶ 35; see Lease [D.E. 13-7] ¶ 3A. The rate was non-negotiable. See Am. Compl. ¶ 35.

The Johnsons' lease was a form lease. It lists AMCC as the owner of the duplex and AMCC Property Management as the property manager authorized to act on AMCC's behalf. See id. ¶ 31; Lease at 3. The lease states that AMCC, as the owner, is "responsible for maintenance and repair of the Premises, and for ensuring that the Premises are safe and habitable." Lease ¶ 12; cf. Am. Compl. ¶ 32. The lease incorporates by reference a document called "the Community Guidelines

3

and Policies" that specifies "additional Owner maintenance responsibilities." Lease ¶ 13. The Johnsons allege that the Community Guidelines and Policies document promises that AMCC would "improve quality of life for service members and their families," would "assume responsibility for the military family Resident's housing at MCB Camp Lejeune," and that AMCC Property Management's staff would "assist Residents in every possible way to ensure superior quality housing services and amenities." Am. Compl. ¶¶ 33–34; [D.E. 34-14] 5. The lease also contains a mold addendum promising that the "Landlord will respond in accordance with the local, federal and state guidelines to repair or remedy." [D.E. 13-7] 19; cf. Am. Compl. ¶ 37.

After living for several months in the new duplex, the Johnsons began to notice problems with water intrusion and water damage, including a cracked foundation and damage to the kitchen, living room, wiring, and electrical outlets. See Am. Compl. ¶¶ 42–43. The water damage led to mold growing in the bedrooms, kitchen, bathrooms, around window sills and electrical outlets, and in at least one closet. See id. ¶¶ 46–49. On one occasion, the Johnsons found water and mold near the microwave. See id. ¶¶ 47–48. The Johnsons also allege that water damage to the home's smoke alarms triggered the alarms unnecessarily. See id. ¶¶ 52, 55. Water also intruded into light fixtures in the home, causing the lights to flicker and burn out. See id. ¶ 51. The water intrusion caused the foundation of the house to shift, creating a gap in the wall between one of the children's bedrooms and the garage, letting in air from the outside. See id. ¶¶ 53–54. The gap revealed termite activity and stains from water damage. See id. ¶ 54.

The Johnsons made numerous service calls requesting repair and maintenance but the problems continued unmitigated. See id. ¶¶ 43, 45. As for the mold near the microwave, repair personnel removed the microwave, cleaned the moldy area, and reinstalled the microwave without addressing the cause of the mold. See id. ¶¶ 47–48. As for water and mold in the electrical outlets,

4

repair personnel came, took pictures, and cleaned the exterior of the outlets but otherwise did not investigate the cause or extent of the mold. See id. ¶ 49. Even after the fire department warned the Johnsons that water in the electrical outlets was a safety hazard, defendants did not remediate the issue but instead advised the Johnsons simply to not use their electrical outlets. See id. ¶ 50. As for the gap in the wall, defendants caulked the gap, but it reappeared in less than one week. See id. ¶ 54. When Lindsey Johnson met with Jim Ferenczy and Jamie Miller, representatives of the defendants, to discuss the issues, Ferenczy fell asleep at one meeting and at another Miller "berated" Johnson for reporting the issues. Id. ¶ 59.

In Fall 2018, repair personnel began remediation work on the front of the duplex. The Johnsons were asked to temporarily move during the repair work. Unfortunately, Hurricane Florence halted the repairs. After the hurricane, the repair personnel never completed their work, the work they completed was inadequate, and the water and mold problems worsened. See id. ¶¶ 56–58. When the Johnsons returned to the duplex, the locks had been changed and the Johnsons had difficulty finding who had the keys, even though their personal property was still in the duplex. See id. ¶ 57. The Johnsons allege that the water and mold problems in the duplex were never adequately addressed or remediated. See id. ¶ 60.

In June 2019, the Johnsons vacated the duplex. See id. ¶ 62. In August 2019, the Johnsons paid a testing company to test the air in the duplex. The testing company found microbial contamination in the air and on surfaces in the duplex. See id. ¶ 63. The Johnsons allege this contamination caused them physical illness, including weight loss, fatigue, and nausea and that they were harmfully exposed to mold and fungi while they lived in the duplex. See id. ¶ 64. The Johnsons also allege they have undergone medical testing that confirms the connection between their illnesses and the microbes and mold in the duplex. See id. ¶ 65.

5

The Johnsons allege (1) unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 ("UDTPA"), (2) violations of the North Carolina Residential Rental Agreements Act, N.C. Gen. Stat. §§ 42-38, et seq. ("RRAA"), (3) negligence, and (4) breach of contract. See id. ¶¶ 66–107.

## II.

Defendants concede the court has personal jurisdiction over AMCC, AMCC Property Management, and Lendlease, but they argue the court lacks personal jurisdiction over Lendlease Holdings, AMCC Managing Member, Winn Management Company, Winn Management Group, and WR South. See Fed. R. Civ. P. 12(b)(2); [D.E. 13] 13–20. The Johnsons respond that the court has both general and specific jurisdiction. See [D.E. 34] 10–17.

Initially, the Johnsons argue defendants waived their personal jurisdiction defense in this action by consenting to personal jurisdiction in Burn v. Lend Lease (US) Public Partnerships LLC, No. 7:20-CV-174-D, 2021 WL 4164685 (E.D.N.C. Sept. 13, 2021) (unpublished). See [D.E. 34] 17. Personal jurisdiction implicates an individual liberty interest under the Due Process Clause. See Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702–04 (1982); Fidrych v. Marriott Int'l, Inc., 952 F.3d 124, 131 (4th Cir. 2020). A party may waive a personal jurisdiction defense in one suit without thereby waiving the same defense in a different lawsuit in the same court. See Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 50 n.5 (2d Cir. 1991) ("A party's consent to jurisdiction in one case, however, extends to that case alone."); Janjua v. Cooper Tire & Rubber Co., Civil Action No. WMN-12-2652, 2013 WL 3776957, at *2 (D. Md. July 17, 2013) (unpublished). Thus, the court considers defendants' personal jurisdiction arguments.

## A.

The Johnsons bear the burden of establishing personal jurisdiction. See UMG Recordings,

6

Inc. v. Kurbanov, 963 F.3d 344, 350 (4th Cir. 2020), cert. denied, 141 S. Ct. 1057 (2021); Grayson v. Anderson, 816 F.3d 262, 267 (4th Cir. 2016); Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). When, as here, a court resolves a personal jurisdiction challenge without holding an evidentiary hearing, a plaintiff initially needs only to make a prima facie showing of personal jurisdiction. See Hawkins v. i-TV Digitalis Tavkozlesi zrt., 935 F.3d 211, 226 (4th Cir. 2019); Sneha Media & Ent., LLC v. Assoc. Broad. Co. P Ltd., 911 F.3d 192, 196–97 (4th Cir. 2018); Grayson, 816 F.3d at 268; Combs, 886 F.2d at 676. "The 'prima facie case' analysis resembles the plausibility inquiry governing motions to dismiss for failure to state a claim under Rule 12(b)(6)." Hawkins, 935 F.3d at 226 (emphasis omitted). Even when a plaintiff initially shows a prima facie case, a plaintiff must eventually prove personal jurisdiction by a preponderance of the evidence. See Sneha Media, 911 F.3d at 197; Grayson, 816 F.3d at 268; Combs, 896 F.2d at 676. In considering whether a plaintiff has established a prima facie case, a court may consider "the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint." Grayson, 816 F.3d at 268; see Hawkins, 935 F.3d at 226; UMG Recordings, 963 F.3d at 350; Mylan Lab'ys, Inc. v. Akzo, N.V., 2 F.3d 56, 60, 62 (4th Cir. 1993). The court considers the allegations and supporting evidence in the light most favorable to the plaintiff. See UMG Recordings, 963 F.3d at 350; Hawkins, 935 F.3d at 226; Grayson, 816 F.3d at 268; Combs, 886 F.2d at 676.

The court does not have personal jurisdiction over a nonresident defendant unless jurisdiction comports with North Carolina's long-arm statute and the Fourteenth Amendment's Due Process Clause. See, e.g., Mitrano v. Hawes, 377 F.3d 402, 406 (4th Cir. 2004). North Carolina's long-arm statute extends personal jurisdiction over nonresident defendants "to the full extent permitted by the [Fourteenth Amendment's] Due Process Clause." Christian Sci. Bd. of Dirs. v. Nolan, 259 F.3d 209,

7

215 (4th Cir. 2001). Thus, the statutory inquiry merges with the constitutional inquiry. See id.

There are two types of personal jurisdiction: general and specific. "A court with general jurisdiction may hear any claim against that defendant, even if all the incidents underlying the claim occurred in a different State." Bristol-Myers Squibb Co. v. Superior Ct., 137 S. Ct. 1773, 1780 (2017). "But only a limited set of affiliations with a forum will render a defendant amenable to general jurisdiction in that State." Id. (quotation omitted); see Daimler AG v. Bauman, 571 U.S. 117, 137 (2014); Fidrych, 952 F.3d at 133. After all, "[a] corporation that operates in many places can scarcely be deemed to be at home in all of them." Daimler, 571 U.S. at 139 n.20; see Fidrych, 952 F.3d at 134.

A court may exercise general jurisdiction over a defendant based on the defendant's general, more persistent contacts with the state. See ALS Scan, Inc. v. Digit. Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002). Exercising general jurisdiction over a corporate defendant is appropriate when the defendant's "affiliations with the State are so continuous and systematic as to render [the defendant] essentially at home in the forum State." BNSF Ry. v. Tyrrell, 137 S. Ct. 1549, 1558 (2017) (quotation omitted); see Daimler, 571 U.S. at 126–33; Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 925–29 (2011). The corporation's state of incorporation and principal place of business are the primary places where general jurisdiction exists. See BNSF Ry., 137 S. Ct. at 1558, Daimler, 571 U.S. at 137; Fidrych, 952 F.3d at 133. Besides these two categories, the Supreme Court has suggested there may be exceptional cases in which a defendant's contacts with another forum render the defendant essentially at home there. See BNSF Ry., 137 S. Ct. at 1558; Daimler, 571 U.S. at 139 n.19; Fidrych, 952 F.3d at 133. Establishing general jurisdiction is "significantly" harder than establishing specific jurisdiction. ALS Scan, 293 F.3d at 715 (quotation omitted).

8

As for specific jurisdiction, due process requires a defendant to have "certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Helicopteros Nacionales de Colom., S.A. v. Hall, 466 U.S. 408, 414 (1984) (alteration and quotations omitted). The minimum contacts analysis focuses on whether a defendant "purposefully directed his activities at residents of the forum" and whether the causes of action arise out of or relate to those activities. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (quotation omitted); see Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024–25 (2021). The analysis ensures that a defendant is not haled into a jurisdiction's court "solely as a result of random, fortuitous, or attenuated contacts." Burger King, 471 U.S. at 475 (quotations omitted); see Ford Motor Co., 141 S. Ct. at 1025. The analysis "focuses on the relationship among the defendant, the forum, and the litigation." Walden v. Fiore, 571 U.S. 277, 284 (2014) (quotation omitted); see Ford Motor Co., 141 S. Ct. at 1024–25; Bristol-Myers Squibb, 137 S. Ct. at 1781.

The extent of the contacts needed for specific jurisdiction turns on whether the claims asserted against a defendant relate to or arise out of the defendant's contacts with the forum state. See Ford Motor Co., 141 S. Ct. at 1025; Bristol-Myers Squibb, 137 S. Ct. at 1780; ALS Scan, 293 F.3d at 712; Atl. Corp. of Wilmington, Inc. v. TBG Tech Co., 565 F. Supp. 3d 748, 760 (E.D.N.C. 2021). If the defendant's contacts with the state are the basis for the suit, specific jurisdiction may exist. ALS Scan, 293 F.3d at 712. In determining specific jurisdiction, the court considers: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Id. (alteration and quotations omitted); see Sneha Media, 911 F.3d at 198; Atl. Corp., 565 F. Supp. 3d at 760. Thus, the "constitutional touchstone" of specific personal jurisdiction "remains whether the

9

defendant purposefully established minimum contacts in the forum State." Burger King, 471 U.S. at 474 (quotation omitted); see Bristol-Myers Squibb, 137 S. Ct. at 1780–82; Walden, 571 U.S. at 284–91.

First, in analyzing the extent to which a defendant purposefully availed itself of the privilege of conducting activities within a State, a court examines "various non-exclusive factors" including:

> (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

UMG Recordings, 963 F.3d at 352 (quotation omitted); see Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009); Atl. Corp., 565 F. Supp. 3d at 760.

Second, the plaintiff's claims must have arisen out of or relate to those activities that the defendant directed at the State. See Ford Motor Co., 141 S. Ct. at 1026–32; UMG Recordings, 963 F.3d 354–55; Atl. Corp., 565 F. Supp. 3d at 760. A court looks at whether the defendant's "activity in the forum state is the genesis of the dispute." UMG Recordings, 963 F.3d at 354 (quotation omitted).

Third, the court must analyze whether the exercise of personal jurisdiction is constitutionally reasonable. See Ford Motor Co., 141 S. Ct. at 1030; Bristol-Myers Squibb, 137 S. Ct. at 1780–81; Burger King, 461 U.S. at 476–78; World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980); Consulting Eng'rs, 561 F.3d at 279; Atl. Corp., 565 F. Supp. 3d at 760–61. This analysis "permits a court to consider additional factors to ensure the appropriateness of the forum once it has determined that a defendant has purposefully availed itself of the privilege of doing business there."

10

Consulting Eng'rs, 561 F.3d at 279. Such factors include:

> (1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social polices.

Id.; see Atl. Corp., 565 F. Supp. 3d at 761.

The Johnsons' claims require the court to determine whether it has personal jurisdiction over parent companies or managing members of the defendant companies over which the parties agree the court has personal jurisdiction. The Johnsons' arguments rest in large part on these parent companies' or managing members' ownership or control over the subsidiaries already subject to the court's jurisdiction. See [D.E. 34] 11–17. Generally, "the contacts of a corporate subsidiary cannot impute jurisdiction to its parent entity." Saudi v. Northrop Grumman Corp., 427 F.3d 271, 276 (4th Cir. 2005). After all, a corporation is a legal entity distinct from its shareholders. See Sky Cable, LLC v. DIRECTV, Inc., 886 F.3d 375, 385 (4th Cir. 2018); Cancun Adventure Tours, Inc. v. Underwater Designer Co., 862 F.2d 1044, 1047 (4th Cir. 1988); Maryland v. Exxon Mobil Corp., 406 F. Supp. 3d 420, 446 (D. Md. 2019). In some circumstances, however, a court may pierce the corporate veil to exercise jurisdiction over a person or entity who would not otherwise be subject to personal jurisdiction. See Sky Cable, 886 F.3d at 391–92; Newport News Holdings Corp. v. Virtual City Vision, Inc., 650 F.3d 423, 433–34 (4th Cir. 2011); Mylan Laby's, 2 F.3d at 60–61; Exxon Mobil, 406 F. Supp. 3d at 446–47; Higgs v. Brian Ctr. Health & Ret./Windsor, Inc., 367 F. Supp. 3d 439, 449 (E.D.N.C. 2019). In such a case, the jurisdictional contacts of the corporation are imputed to the member because the member and the corporation are alter egos. See Sky Cable, 886 F.3d at 392; Higgs, 406 F. Supp. 3d at 449. Although "[t]he law of the state in which an entity is incorporated generally governs the question whether a court may pierce an entity's veil," Sky Cable,

11

886 F.3d at 386, when the reason for disregarding the corporate form is the exercise of personal jurisdiction, a court applies the law of the forum state. See Newport News Holdings Corp., 650 F.3d at 434; Mylan Lab'ys, 2 F.3d at 61; Exxon Mobil, 406 F. Supp. 3d at 447; Burns & Russell Co. of Balt. v. Oldcastle, Inc., 198 F. Supp. 2d 687, 697 (D. Md. 2002).

North Carolina law recognizes piercing the corporate veil to establish personal jurisdiction. See, e.g., Saft Am., Inc. v. Plainview Batteries, Inc., 189 N.C. App. 579, 588, 659 S.E.2d 39, 45–46 (2008), rev'd in part on other grounds, 363 N.C. 5, 673 S.E.2d 864 (2009). Under North Carolina's instrumentality rule, to pierce the corporate veil a plaintiff "must show that the corporation is so operated that it is a mere instrumentality or alter ego of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State." Green v. Freeman, 367 N.C. 136, 145, 749 S.E.2d 262, 270 (2013) (quotation omitted); see State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 362 N.C. 431, 439–41, 666 S.E.2d 107, 113–14 (2008); Glenn v. Wagner, 313 N.C. 450, 454, 329 S.E.2d 326, 330 (1985); Henderson v. Sec. Mortg. & Fin. Co., 273 N.C. 253, 260, 160 S.E.2d 39, 44 (1968); Saft. Am., 189 N.C. App. at 588, 659 S.E.2d at 46. Evidence for such a showing includes (1) inadequate capitalization, (2) noncompliance with corporate formalities, (3) lack of a separate corporate identity; (4) excessive fragmentation, (5) siphoning funds from the company by the dominant shareholder, (6) nonfunctioning officers and directors, and (7) a lack of corporate records. See Green, 367 N.C. at 145, 749 S.E.2d at 270; Glenn, 313 N.C. at 455, 329 S.E.2d at 330–31.

Even when evidence supports disregarding the corporate form, imposing liability under North Carolina's "instrumentality rule" is only appropriate if three elements exist: (1) the dominant shareholder's complete domination over the finances, policies, and business practices of the incident, event, or transaction being attacked, (2) the defendant must have exercised such control "to commit

12

[a] fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights," and (3) the defendant's exercise of control and breach of duty must have proximately caused the plaintiff's injuries or loss. Glenn, 313 N.C. at 455, 329 S.E.2d at 330; see Green, 367 N.C. at 145–46, 749 S.E.2d at 270; State ex rel. Cooper, 362 N.C. at 441, 666 S.E.2d at 114.

## B.

The Johnsons have not made a prima facie case that the court has personal jurisdiction over Lendlease Holdings, AMCC Managing Member, Winn Management Company, Winn Management Group, and WR South. As for general jurisdiction, Lendlease Holdings, AMCC Managing Member, Winn Management Company, Winn Management Group, and WR South do not have the requisite affiliations to be at home in North Carolina for this court's general jurisdiction. See BNSF Ry., 137 S. Ct. at 1558, Daimler, 571 at 137; Fidrych, 952 F.3d at 133. Lendlease Holdings and AMCC Managing Member are incorporated in Delaware and have principal places of business in Tennessee. See Am. Compl. ¶¶ 11–12; [D.E. 13-2] ¶¶ 3–4; [D.E. 13-3] ¶¶ 3–4. Winn Management Company and Winn Management Group are incorporated in Delaware and Massachusetts, respectively, and both have their principal places of business in Massachusetts. See Am. Compl. ¶ 18; [D.E. 13-4] ¶¶ 3–4; [D.E. 13-5] ¶¶ 3–4.[2] WR South is incorporated in Delaware and has its principal place of business in Massachusetts. See Am. Compl. ¶ 17; [D.E. 13-6] ¶¶ 3–4.

In opposition, the Johnsons primarily argue that defendants' nesting-doll corporate structure combined with their connection to the military housing at MCB Camp Lejeune creates general

---

[2] The amended complaint and defendants' declaration differ on whether Winn Management Company is organized under the laws of Delaware or Massachusetts. Compare Am. Compl. ¶ 18, with [D.E. 13-4] ¶ 3. Regardless, both parties agree Winn Management Company is not organized under the laws of North Carolina.

13

jurisdiction. As for Lendlease Holdings, the Johnsons argue general jurisdiction exists because Lendlease Holdings is the sole member of AMCC Managing Member, which is the controlling member of AMCC. See [D.E. 34] 13. Similarly, the Johnsons argue that exercising general jurisdiction over AMCC Managing Member is appropriate because it is AMCC's managing member. See id. The Johnsons argue exercising general jurisdiction over Winn Management Group is appropriate because AMCC Property Management is a division of Winn Management Group and because Winn Management Group and AMCC Property Management employed repair workers at MCB Camp Lejeune. See id. at 14. The Johnsons argue general jurisdiction exists over WR South because WR South has been involved with the military housing at MCB Camp Lejeune for over a decade. See id. at 15.

Standing alone, these alleged facts do not plausibly show the court has general jurisdiction over Lendlease Holdings, AMCC Managing Member, Winn Management Company, Winn Management Group, and WR South. Simply put, these defendants are not at home in North Carolina.

The Johnsons also have not made a prima facie case that this court has specific jurisdiction over Lendlease Holdings, AMCC Managing Member, Winn Management Company, Winn Management Group, and WR South. The Johnsons' specific jurisdiction argument is generalized to all defendants, arguing their involvement with the military housing at MCB Camp Lejeune is sufficient contact with North Carolina to exercise personal jurisdiction. See [D.E. 34] 15–16.

As for purposeful availment, declarations from these defendants state they have never maintained a headquarters or principal place of business in North Carolina. See [D.E. 13-2] ¶ 4; [D.E. 13-3] ¶ 4; [D.E. 13-4] ¶ 4; [D.E. 13-5] ¶ 4; [D.E. 13-6] ¶ 4. These defendants do not own any real or personal property on or near the Johnsons' duplex. See [D.E. 13-2] ¶ 5; [D.E. 13-3] ¶ 5;

14

[D.E. 13-4] ¶ 5; [D.E. 13-5] ¶ 5; [D.E. 13-6] ¶ 5. Moreover, none of these defendants is a party to the Johnsons' lease. See Lease at 3. These defendants, however, do business in North Carolina and reached into North Carolina to construct and maintain privatized military housing. See Am. Compl. ¶¶ 10–20, 28–29; see, e.g, [D.E. 34-5, 34-6, 34-8, 34-15, 34-19]. Those business activities started around 2005 and constitute long-term activities within North Carolina. See Am. Compl. ¶¶ 28–29. Construing the record in the light most favorable to the Johnsons, the Johnsons have made a prima facie case that these defendants purposefully availed themselves of the privilege of doing business in North Carolina.

Even so, the Johnsons do not make a prima facie showing that their claims arise out of these defendants' activities. Even though some of these defendants were initially involved in the military housing project, their subsidiaries performed much of the work. For example, Lendlease was involved in the construction and renovation of military housing at MCB Camp Lejeune. See Am. Compl. ¶ 10. AMCC Managing Member was the original lessee in the ground lease, but AMCC Managing Member quickly transferred its interests to AMCC. As the Johnsons allege, AMCC was created "to own, lease, manage, acquire, operate, and maintain Improvements of the Land." Id. ¶ 26 (quotation omitted). Consistent with that purpose, the Johnsons' lease lists AMCC as the property owner and AMCC Property Management as the manager. See Lease at 3. Thus, the Johnsons' claims arose from Lendlease's, AMCC's, and AMCC Property Management's contacts with North Carolina. Defendants' declarations, which the Johnsons have not rebutted, support this conclusion. Representatives of Lendlease Holdings, AMCC Managing Member, Winn Management Company, Winn Management Group, and WR South have declared that these defendants "have never owned, built, operated, managed, or maintained the Plaintiffs' housing as alleged in their Complaint." [D.E. 13-2] ¶ 6; [D.E. 13-3] ¶ 6; [D.E. 13-4] ¶ 6; [D.E. 13-5] ¶ 6; [D.E. 13-6] ¶ 6. Thus, the Johnsons have

15

not made a prima facie showing that the court has specific jurisdiction over Lendlease Holdings, AMCC Managing Member, Winn Management Company, Winn Management Group, or WR South.

Nonetheless, even without having general or specific jurisdiction over these defendants, the court may impute the contacts of Lendlease, AMCC Managing Member, and AMCC Property Management to their parent companies or dominant members if the Johnsons "show that the corporation is so operated that it is a mere instrumentality or alter ego of the sole or dominant shareholder and a shield for his activities in violation of the declared public policy or statute of the State." Green, 367 N.C. at 145, 749 S.E.2d at 270 (quotation omitted). The Johnsons have alleged that the defendants acted jointly and were alter egos of each other. See Am. Compl. ¶¶ 20–21. However, besides general allegations concerning defendants' corporate structure and lack of "corporate separateness," id. ¶ 21, the Johnsons do not plausibly allege the indicia of control required under North Carolina law. See, e.g., Green, 367 N.C. at 145, 749 S.E.2d at 270; State ex rel. Cooper, 362 N.C. at 441, 666 S.E.2d at 114; Glenn, 313 N.C. at 455, 329 S.E.2d at 330–31. Moreover, defendants' declarations contradict the Johnsons' generalized allegations. Indeed, the declarations each attest that Lendlease Holdings, AMCC Managing Member, Winn Management Company, Winn Management Group, and WR South have "never exercised direct or indirect control over any entity which has owned, built, operated, managed, or maintained the Plaintiffs' housing as alleged in their Complaint." [D.E. 13-2] ¶ 7; see [D.E. 13-3] ¶ 7; [D.E. 13-4] ¶ 7; [D.E. 13-5] ¶ 7; [D.E. 13-6] ¶ 7. In light of these declarations, and because "[d]isregarding the corporate form is not to be done lightly," the court declines to impute Lendlease's, AMCC's, and AMCC Property Management's contacts with North Carolina to these other defendants. Green, 367 N.C. at 145, 749 S.E.2d at 270.

The court does not have personal jurisdiction over Lendlease Holdings, AMCC Managing Member, Winn Management Company, Winn Management Group, and WR South. See, e.g., Higgs,

16

367 F. Supp. 3d at 448–50. Accordingly, the court dismisses without prejudice these defendants, and the Johnsons' case will proceed against Lendlease, AMCC, and AMCC Property Management.

## III.

The remaining defendants argue the court lacks subject-matter jurisdiction over this case because defendants are entitled under Yearsley v. W. A. Ross Construction Company, 309 U.S. 18 (1940), to derivative sovereign immunity as agents for the federal government. See [D.E. 13] 20–24.[3] The Johnsons respond that defendants are not entitled to derivative sovereign immunity because defendants did not comply with the federal government's instructions to provide adequate military housing. See [D.E. 34] 18–21.

Under Yearsley, federal government "contractors and common law agents acting within the scope of their employment for the United States have derivative sovereign immunity." Butters v. Vance Int'l, Inc., 225 F.3d 462, 466 (4th Cir. 2000); see Yearsley, 309 U.S. at 20–21; In re KBR, Inc., Burn Pit Litig., 744 F.3d 326, 343 (4th Cir. 2014). Derivative sovereign immunity is narrower than "the Government's embracive immunity." Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 166 (2016). A government contractor qualifies for derivative sovereign immunity "if (1) the government authorized the contractor's actions and (2) the government validly conferred that authorization, meaning it acted within its constitutional power." In re KBR, 744 F.3d at 342 (quotation omitted); see Cunningham, 888 F.3d at 643, 646. In assessing derivative sovereign immunity pretrial, the court "construe[s] the record in a light favorable to the party seeking to avoid summary disposition." Campbell-Ewald, 577 U.S. at 168.

Merely operating under a government authorization is insufficient to claim derivative

---

[3] Yearsley immunity is a jurisdictional defense properly raised under Rule 12(b)(1). See Cunningham v. Gen. Dynamics Info. Tech., Inc., 888 F.3d 640, 649–51 (4th Cir. 2018).

17

sovereign immunity. See In re KBR, 744 F.3d at 345 ("[S]taying within the thematic umbrella of the work that the government authorized is not enough to render the contractor's activities the acts of the government" (alteration and quotation omitted)); Cunningham, 888 F.3d at 647. Instead, "the contractor must adhere to the government's instructions." In re KBR, 744 F.3d at 345. Thus, "[w]hen a contractor violates both federal law and the [g]overnment's explicit instructions," derivative sovereign immunity does not shield it from liability. Campbell-Ewald, 577 U.S. at 166; see Cunningham, 888 F.3d at 647.

At this stage, defendants are not entitled to derivative sovereign immunity. The Johnsons allege that the government authorized Lendlease, AMCC, and AMCC Property Management to build and maintain rental housing for military personnel and their families at MCB Camp Lejeune. See Am. Compl. ¶¶ 25–29; cf. [D.E. 34-7].[4] Moreover, the Johnsons plausibly allege these defendants promised quality housing in exchange for the Johnsons' full BAH but that instead, defendants provided substandard housing to the Johnsons, failed to adequately remediate the problems with the housing, and that the deleterious effects of these problems physically harmed the Johnsons. See Am. Compl. ¶¶ 30–65. In opposition, defendants argue the Johnsons do not allege the specific terms of defendants' operating agreement and lease with the U.S. Navy and that defendants breached those terms. See [D.E. 13] 23. Thus, according to the defendants, the Johnsons allegations that defendants are not entitled to derivative sovereign immunity are "nothing more than a legal conclusion unmoored from any well-pleaded facts." Id.

_____

[4] Defendants argue primarily that the Johnsons "fail[] to allege sufficient facts to support subject matter jurisdiction" because they fail to allege sufficient facts to overcome defendants' claim to derivative sovereign immunity. Because defendants challenge the factual sufficiency of the Johnsons' allegations, the court "assume[s] the truthfulness of the facts alleged" in the Johnsons' amended complaint. Kerns v. United States, 585 F.3d 187, 193 (4th Cir. 2009); see [D.E. 13] 23. That inquiry is "a standard patterned on Rule 12(b)(6)." Kerns, 585 F.3d at 193.

18

Even without the lease and operating agreement, the Johnsons' showing suffices at this stage. Cf. [D.E. 34-25] (email exchanges in which the Johnsons' counsel asked for copies of the lease and operating agreement and defendants declined to produce them). It strains judicial experience and common sense to conclude that the government's "explicit instructions" to defendants were to provide substandard housing and then repeatedly fail to remediate the problems with the housing to the detriment of servicemembers and their families. Campbell-Ewald, 577 U.S. at 166; see Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Notably, the Johnsons allege that Congress privatized military housing because of "concerns about the effect of poor-quality housing on servicemember families." Am. Compl. ¶ 25. Defendants' military housing units, the Johnsons allege, were part of Congress's effort to address those concerns. See id. ¶¶ 26–29. And although Congress meant to remedy problems of "poor-quality housing," the Johnsons allege defendants did precisely the opposite with the Johnsons' duplex. See id. ¶¶ 30–65. Defendants' construction and maintenance of military housing might have been within the "thematic umbrella" of their government-authorized work, In re KBR, 744 F.3d at 345, but the Johnsons plausibly allege that defendants did not follow the government's "explicit instructions." Campbell-Ewald, 577 U.S. at 166. Thus, at this stage, defendants cannot claim derivative sovereign immunity, and the court denies their motion to dismiss. See Childs v. San Diego Family Housing, LLC, No. 19cv2329 JM (MDD), 2020 WL 12689448, at *1 n.1–2, 7 (S.D. Cal. Sept. 15, 2020) (unpublished) ("Certainly, nothing in the record suggests that [the defendants] were directed to act negligently or to violate [state] law with respect to their duties as landlords" providing military housing.), appeal dismissed, 22 F.4th 1092 (9th Cir. 2022).

Alternatively, even if defendants are correct that the Johnsons' allegations are insufficient, the court would still deny defendants' Rule 12(b)(1) motion to dismiss. In In re KBR, the Fourth Circuit held that the district court erred by finding the defendant was entitled to derivative sovereign

19

immunity when "the record [did] not contain enough evidence to determine whether [the defendant] acted in conformity with [its contract], its appended task orders, and any laws and regulations that the contract incorporates." 744 F.3d at 345. Without having the ground lease, operating agreement, any subsequent amendments or addenda, or related contracts in the record, the court would make the same error if it were to find at this early stage of the case that defendants have derivative sovereign immunity. See Cunningham, 888 F.3d at 650 ("Notwithstanding that Yearsley immunity operates as a jurisdictional bar to suit, we recognize that discovery may be appropriate before granting a Rule 12(b)(1) motion to dismiss on this basis."); Lobisch v. United States, Civ. No. 20-00370 HG-KJM, 2021 WL 2150690, at *5 (D. Haw. May 26, 2021) (unpublished). Thus, the court denies without prejudice defendants' motion to dismiss under Rule 12(b)(1).

IV.

The remaining defendants argue the court should dismiss the Johnsons' amended complaint under Rule 12(b)(6) because (1) the Johnsons did not do pre-suit mediation with defendants; (2) the amended complaint violates Rule 8(a) by failing to distinguish among defendants; (3) the federal-enclave doctrine bars the Johnsons' claims; (4) the Johnsons' UDTPA claim does not comply with Rule 9(b); and (5) the Johnsons fail to state a breach of contract claim against defendants who were not parties to their lease. See [D.E. 13] 24–38.

The Johnsons respond that defendants are collaterally estopped from making these arguments because of the court's rulings on identical issues in Burn. See [D.E. 34] 9–10. Although the Johnsons were originally parties to that lawsuit, they voluntarily dismissed their claims before the court ruled on defendants' motion to dismiss. See Burn, 2021 WL 4164685 at *1 n.1. Even assuming the Johnsons could meet the elements for collateral estoppel, a court should not apply nonmutual offensive collateral estoppel "where a plaintiff could easily have joined in the earlier

20

action." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331 (1979); see In re Microsoft Corp. Antitrust Litig., 355 F.3d 322, 326 (4th Cir. 2004). Thus, the court declines to apply collateral estoppel and considers defendants' arguments.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Iqbal, 556 U.S. at 677–80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to [the nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a party's factual allegations must "nudge[ ] [its] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court may also consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary

21

judgment. Goines, 822 F.3d at 166. Additionally, a court may take judicial notice of public records. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

Resolving defendants' arguments requires the court to apply North Carolina substantive law.[5] Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from the Supreme Court of North Carolina, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation and citation omitted).[6] In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Town of Nags Head, 728 F.3d at 398 (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-

---

[5] The Johnsons' lease contains a choice-of-law provision, which states in relevant part: "[T]his Lease and the contractual relationship between the parties shall be construed exclusively in accordance with, and shall be exclusively governed by, federal substantive law, except that the following State law shall apply: the substantive laws of the State of North Carolina, including but not limited to North Carolina General Statutes, chapter 42, and the common law interpreting those statutes." Lease ¶ 33.

[6] North Carolina has no mechanism for certifying questions of state law to the Supreme Court of North Carolina. See Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013).

22

Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

## A.

Defendants argue the court must dismiss the Johnsons' case because the Johnsons did not do pre-suit mediation with defendants. See [D.E. 13] 25–28. Under North Carolina law, interpreting a written contract is a question of law for the court. See Briggs v. Am. & Efird Mills, Inc., 251 N.C. 642, 644, 111 S.E.2d 841, 843 (1960); Brown v. Between Dandelions, Inc., 273 N.C. App. 408, 410, 849 S.E.2d 67, 70 (2020), disc. review denied, 376 N.C. 900, 854 S.E.2d 796 (2021); N.C. Farm Bureau Mut. Ins. Co. v. Mizell, 138 N.C. App. 530, 532, 530 S.E.2d 93, 95 (2000). "[T]he court may not ignore or delete any of [the contract's] provisions, nor insert words into it, but must construe the contract as written, in light of the undisputed evidence as to the custom, usage, and meaning of its terms." Martin v. Martin, 26 N.C. App. 506, 508, 216 S.E.2d 456, 457–58 (1975); see T.M.C.S., Inc. v. Marco Contractors, Inc., 244 N.C. App. 330, 342, 780 S.E.2d 588, 597 (2015). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." Hemric v. Groce, 169 N.C. App. 69, 76, 609 S.E.2d 276, 282 (2005) (quotation omitted); see State v. Phillip Morris USA Inc., 363 N.C. 623, 631–32, 685 S.E.2d 85, 90 (2009); Potter v. Hilemn Lab'ys, Inc., 150 N.C. App. 326, 331, 564 S.E.2d 259, 263 (2002); Bicket v. McLean Secs., Inc., 124 N.C. App. 548, 552, 478 S.E.2d 518, 521 (1996).

The Johnsons' lease contains a mediation provision, which states in relevant part:

Owner and Resident agree to mediate any dispute or claim arising between them out of this Lease, before resorting to court action. Mediation fees, if any, shall be divided equally among the parties involved. The parties agree to use a mediator selected from the mediation list incorporated in the Community Guidelines and Policies. If, for any dispute or claim to which this paragraph applies, any party commences an

23

action without first attempting to make reasonable efforts to resolve the matter through mediation, or refuses to mediate in good faith after a request has been made, then that party shall not be entitled to recover attorneys' fees even if that party eventually prevails in the court proceeding.

Lease ¶ 32. The plain language of the lease's mediation provision requires the parties to "make reasonable efforts to resolve [any dispute or claim to which this paragraph applies] through mediation." Id. If a party does not make reasonable efforts to mediate, the mediation provision provides the remedy: "[T]hat party shall not be entitled to recover attorneys' fees even if that party eventually prevails in the court proceeding." Id. This mediation provision is not a condition precedent to litigation. It is a condition precedent to attorneys' fees. After all, the mediation provision remedies the failure to mediate solely by precluding recovery of attorneys' fees.

In opposition, defendants cite Hometown Services, Inc. v. Equitylock Solutions, Inc., No. 1:13-cv-00304-MR-DLH, 2014 WL 4406973, at *1–3 (W.D.N.C. Sept. 5, 2014) (unpublished), and argue that the mediation provision requires dismissal. See [D.E. 13] 26–28. In Hometown, however, the mediation provision stated "any controversy, claim, or dispute arising under or relating to this [a]greement, shall first be subject to mediation in Buncombe County, NC . . . and then finally be settled in a court of competent jurisdiction as set forth herein." See Ex. A at 4, Hometown Servs., Inc. v. Equitylock Sols., Inc., No. 1:13-cv-00304-MR-DLH (W.D.N.C. Dec. 16, 2013) (unpublished), [D.E. 14-1]. That provision provided no remedy for failing to mediate, and the court interpreted the provision to require mediation before litigation. See Hometown, 2014 WL 4406973, at *2. In contrast, the mediation provision in this case provides a remedy for failing to mediate: the party shall not be entitled to recover attorneys' fees. See Lease ¶ 32. Thus, the mediation provision in this case is a condition precedent to recovering attorneys' fees, not a condition precedent to litigation.

Case 7:21-cv-00188-D   Document 55   Filed 07/05/22   Page 24 of 33

The Johnsons do not allege in their amended complaint whether they made reasonable pre-suit efforts to mediate their dispute with defendants. Nonetheless, any failure to mediate would only preclude the Johnsons from recovering attorneys' fees. It does not require dismissal of this action. See Burn, 2021 WL 4164685, at *4–5.

## B.

Defendants argue the court should dismiss the Johnsons' amended complaint for failure to comply with Rule 8(a). See [D.E. 13] 28–31. Rule 8(a) provides, in part, "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Rule 8(a)'s requirements are calculated to "give the defendant fair notice of what the [plaintiff's] claim is and the grounds upon which it rests." Twombly, 550 U.S. at 555 (cleaned up); see Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512 (2002); Shepherd v. City of Shreveport, 920 F.3d 278, 287 (5th Cir. 2019); Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005). Generally, "collective allegations are not prohibited by [Rule 8(a)]. Rather, the allegations must simply provide Defendants with fair notice of the claims against them." Walker v. Apex Wind Constr. LLC, No. CIV-14-914-D, 2015 WL 348778, at *3 (W.D. Okla. Jan. 26, 2015) (unpublished); see Page v. Corvias Grp., LLC, No. 5:20-CV-336-D, 2021 WL 4163562, at *5–6 (E.D.N.C. Sept. 13, 2021) (unpublished).

Defendants argue that the Johnsons' failure to sufficiently distinguish among defendants in their amended complaint requires the court to dismiss the amended complaint. See [D.E. 13] 28–31. The amended complaint first lists each defendant and then states that each defendant "acted as a joint tortfeasor, agent of the others, joint venture participant, or has otherwise engaged in, and aided and abetted one another in, the joint enterprise of leasing military housing at MCB Camp Lejeune" and that there is a "unity of interest and ownership" among defendants that makes them "alter ego[s] of

25

each other." Am. Compl. ¶¶ 20–21. The amended complaint then makes collective allegations concerning "Defendants" without, in many instances, further identifying the individual defendants. See, e.g., id. ¶¶ 30–65.

The Johnsons' amended complaint provides defendants with fair notice of the claims against them. As discussed, the Johnsons' conclusion that defendants are alter egos does not suffice to establish personal jurisdiction over Lendlease Holdings, AMCC Managing Member, Winn Management Company, Winn Management Group, or WR South. Only Lendlease, AMCC, and AMCC Property Management remain as defendants in the case. The Johnsons allege that Lendlease did "construction, renovation, and/or demolition work at MCB Camp Lejeune" as part of building privatized military housing. Am. Compl. ¶ 10. Once built, AMCC owned the duplex the Johnsons rented and AMCC Property Management was the duplex's property manager. See Lease at 3. In light of these allegations, the Johnsons' amended complaint gives defendants' fair notice of the claims, which all arise from defendants' conduct at MCB Camp Lejeune and the Johnsons' rental of the 7061 Omaha Road duplex. Accordingly, Rule 8(a) does not warrant dismissal of this action. See Burn, 2021 WL 4164685, at *6; Page, 2021 WL 4163562, at *5–6.

## C.

Defendants argue the federal-enclave doctrine bars the Johnsons' claims and requires dismissal of the amended complaint. See [D.E. 13] 31–34. The federal-enclave doctrine provides that when "the United States acquires with the consent of the state legislature land within the borders of that State . . . the jurisdiction of the Federal Government becomes exclusive." Allison v. Boeing Laser Tech. Servs., 689 F.3d 1234, 1236 (10th Cir. 2012) (quotations omitted); see Paul v. United States, 371 U.S. 245, 264 (1963); cf. Mayor & City Council of Balt. v. BP P.L.C., 31 F.4th 178, 217–18 (4th Cir. 2022). Under the doctrine, absent "applicable federal legislation displacing state

26

law, those state laws that existed at the time the enclave was ceded to the federal government remain in force." Allison, 689 F.3d at 1237. Thus, "even though state law will not remain static outside the enclave, any changes made to the state law applicable within the enclave must be a matter of federal law." Id.; see James Stewart & Co. v. Sadrakula, 309 U.S. 94, 99–100 (1940).

Defendants contend that all of the claims alleged in the amended complaint are made under North Carolina law not in existence in 1941, the year the federal government acquired MCB Camp Lejeune from North Carolina. See [D.E. 13] 31–33. Defendants then argue that the federal-enclave doctrine requires the court to dismiss the amended complaint. See id.

The court need not address defendants' federal-enclave argument, however, because the Johnsons' lease contains an enforceable choice-of-law provision. See Lease ¶ 33. This court has federal question jurisdiction. See Akin v. Ashland Chem. Co., 156 F.3d 1030, 1034 & n.1 (10th Cir. 1998); Stokes v. Adair, 265 F.2d 662, 664–65 (4th Cir. 1959); Mater v. Holley, 200 F.2d 123, 124 (5th Cir. 1952); cf. Mayor & City Council of Balt., 31 F.4th at 217–19. Thus, federal law determines the applicable choice-of-law principles. See Meadows v. Northrop Grumman Innovation Sys., Inc., 436 F. Supp. 3d 879, 886 & n.7 (W.D. Va. 2020); cf. Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 795 (2d Cir. 1980). Absent federal legislation to the contrary, the applicable federal law is "those state laws that existed at the time the enclave was ceded to the federal government." Allison, 689 F.3d at 1237; see Mater, 200 F.2d at 124; Meadows, 436 F. Supp. 3d at 886 & n.7; Federico v. Lincoln Mil. Hous., 901 F. Supp. 2d 654, 665 (E.D. Va. 2012). Under North Carolina law when MCB Camp Lejeune became a federal enclave (i.e., 1941), the choice-of-law provision in the Johnsons' lease is enforceable. Cf. JAAAT Tech. Servs., LLC v. Tetra Tech Tesoro, Inc., No. 3:15CV235, 2017 WL 4003026, at *9 & n.13 (E.D. Va. Sept. 11, 2017) (unpublished). In 1941, and today, North Carolina considered the contracts' contents to reflect the

27

parties' intent and enforced that intent unless it was illegal or violated North Carolina public policy. See Chambers v. Byers, 214 N.C. 373, 199 S.E. 398, 401 (1938). North Carolina applied a presumption that the parties intended "that the law of the place where the contract is made is prima facie that which the parties intended." Cannaday v. Atl. Coast Line R. Co., 143 N.C. 439, 55 S.E. 836, 837–38 (1906). That presumption, however, held only absent "circumstances indicating a different intention." Id.; see Bundy v. Com. Credit Co., 200 N.C. 511, 517, 157 S.E. 860, 863 (1931); Carpenter, Baggott & Co. v. Hanes, 167 N.C. 551, 83 S.E. 577, 581 (1914) ("Parties are presumed to contract in reference to the laws of the country in which the contract is made, and where it is to be paid, unless otherwise expressed. The maxim is that locus contractus regit actum, unless the intention of the parties to the contrary be clearly shown."); Arrington v. Gee, 27 N.C. 590, 594 (1845) ("[W]hen a contract states that the parties had in view the law of another country, when they made it, then it is but right to say, that the contract should be governed by the law the parties thus appear to have intended, rather than by that of the loci contractus."). Moreover, North Carolina disregarded the parties' choice of law where there was no connection between the contract and the law elected for its enforcement and to guard against manufactured efforts to avoid compliance with North Carolina public policy. See, e.g, Bundy, 200 N.C. at 516, 157 S.E. at 862 (refusing to apply the "intention of the parties that the validity and performance [of the contract] should be governed by the laws of Maryland" when the contract was to be performed in North Carolina and was executed in Maryland "for the purpose of evading the usury laws of [North Carolina]."); see also Burrus v. Witcover, 158 N.C. 384, 74 S.E. 11, 11 (1912).

The choice-of-law provision in the Johnsons' lease states, in relevant part:

[T]his Lease and the contractual relationship between the parties shall be construed exclusively in accordance with, and shall be exclusively governed by, federal substantive law, except that the following State law shall apply: the substantive laws

of the State of North Carolina, including but not limited to North Carolina General
Statutes, chapter 42, and the common law interpreting those statutes.

Lease ¶ 33. The plain language of the lease's choice-of-law provision states that "the substantive laws of the State of North Carolina" govern the parties' contractual relationship, and it does not limit the application of North Carolina law to those laws as they stood in 1941. Id. Thus, the Johnsons may allege claims under contemporary North Carolina law and defendants' argument fails. Cf. Burn, 2021 WL 4164685, at *6–7; Page, 2021 WL 4163562, at *6–7.

## D.

Defendants argue the court should dismiss the Johnsons' UDTPA claim for failure to comply with Rule 9(b). See [D.E. 13] 34–37. Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[T]he circumstances required to be pled with particularity under Rule 9(b) are the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (quotations omitted); see Edmonson v. Eagle Nat'l Bank, 922 F.3d 535, 553 (4th Cir. 2019). "[L]ack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)." Harrison, 176 F.3d at 783 n.5. Nonetheless, "a court should hesitate to dismiss a [claim] under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." Edmonson, 922 F.3d at 553 (quotation omitted); see Harrison, 176 F.3d at 784.

The UDTPA provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen.

29

Stat. § 75-1.1(a). To state an unfair and deceptive trade practices claim, a plaintiff must plausibly allege: "(1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 71–72, 653 S.E.2d 393, 399 (2007); see SciGrip, Inc. v. Osae, 373 N.C. 409, 426, 838 S.E.2d 334, 347 (2020). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. A practice is deceptive if it has the capacity or tendency to deceive." Walker, 362 N.C. at 72, 653 S.E.2d at 399 (cleaned up). "[I]t is not necessary for the plaintiff to show fraud, bad faith, deliberate or knowing acts of deception, or actual deception, but plaintiff must show that the acts complained of possessed the tendency or capacity to mislead, or created the likelihood of deception." Gress v. Rowboat Co., 190 N.C. App. 773, 776, 661 S.E.2d 278, 281 (2008) (alteration and quotation omitted); see Overstreet v. Brookland, Inc., 52 N.C. App. 444, 452–53, 279 S.E.2d 1, 7 (1981).

To state a claim based on alleged misrepresentations, a plaintiff must plausibly allege "reliance on the misrepresentation in order to show the necessary proximate cause." Bumpers v. Cmty. Bank of N. Va., 367 N.C. 81, 88–89, 747 S.E.2d 220, 226 (2013). "Reliance, in turn, demands evidence showing that the plaintiff suffered actual injury as a proximate result of defendant's deceptive statement or misrepresentation." Id. at 89, 747 S.E.2d at 227 (quotation and alteration omitted). The burden of proof is similar to a fraud claim. See id., 747 S.E.2d at 227.

Although Rule 9(b) applies primarily to fraud and mistake, a strong correlation exists between a traditional fraud claim and an unfair and deceptive trade practices claim based on detrimental reliance on deceptive misrepresentations, even when the alleged misrepresentations do not constitute fraud. Based on that strong correlation, Rule 9(b) applies to unfair and deceptive trade practices claims based on alleged misrepresentations. See, e.g., Sasso v. Tesla, Inc., No. 5:21-CV-

30

24-D, 2022 WL 363850, at *10 (E.D.N.C. Feb. 7, 2022); Cross v. Ciox Health, LLC, 438 F. Supp. 3d 572, 584–86 (E.D.N.C. 2020); Topshelf Mgmt., Inc. v. Campbell-Ewald Co., 117 F. Supp. 3d 722, 728–32 (M.D.N.C. 2015).

Rule 9(b) does not require dismissal of the Johnsons' UDTPA claim. As for unfair practices, the Johnsons plausibly allege a breach of the implied warranty of habitability, RRAA violations, and the offering, marketing, and leasing of substandard rental housing in exchange for the Johnsons' full BAH. See Am. Compl. ¶¶ 70(a), (b), (d), (g), 81–91, 102. These claims sound more broadly than fraud and are not subject to Rule 9(b). See Burn, 2021 WL 4164685, at *8. As for a UDTPA claim based on deceptive misrepresentations, the Johnsons complied with Rule 9(b). The Johnsons allege defendants misrepresented the nature of the services defendants provided and that the Johnsons relied on those misrepresentations to their detriment when they rented housing from defendants. When the Johnsons signed their lease, they affirmed that they "ha[d] been provided with . . . a copy of the Community Guidelines and Policies." Lease ¶ 11(B). The Johnsons quote specific lines from that document that make representations about defendants' housing and services, such as that defendants provide "superior quality housing." Am. Compl. ¶¶ 32–34. Thus, the Johnsons complied with Rule 9(b) by alleging the specific document in which defendants made allegedly deceptive misrepresentations, quoting specific lines that they allege are misrepresentations, and alleging the time defendants made the allegedly deceptive misrepresentations to the Johnsons (i.e., at or before the time the Johnsons' signed their lease in October 2015).

Alternatively, and in any event, defendants are aware of the circumstances for which they will have to prepare a defense at trial, and the Johnsons have substantial prediscovery evidence of the facts animating those circumstances. See Edmonson, 922 F.3d at 553; Harrison, 176 F.3d at 784. Thus, the court denies defendants' motion to dismiss the Johnsons' UDTPA claim for failure to

31

comply with Rule 9(b).

E.

Finally, defendants argue the Johnsons may not allege a breach of contract claim against any other defendant besides AMCC. See [D.E. 13] 37–38. The Johnsons agree. See [D.E. 34] 10.

"[A] contract cannot bind a nonparty." EEOC v. Waffle House, Inc., 534 U.S. 279, 294 (2002); see NRG Power Mktg., LLC v. Maine Pub. Utils. Comm'n, 558 U.S. 165, 175 n.4 (2010); Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 632 (2009). Thus, in general, parties to a contract cannot maintain an action against nonparties based on the contract. See Canady v. Mann, 107 N.C. App. 252, 259, 419 S.E.2d 597, 601 (1992); see also Richmond Health Facilities v. Nichols, 811 F.3d 192, 200–01 (6th Cir. 2016); Ferrante v. Westin St. John Hotel Co., 559 F. Supp. 3d 492, 503–04 (E.D.N.C. 2020), aff'd, No. 20-1322, 2022 WL 396022 (4th Cir. Feb. 9, 2022) (per curiam) (unpublished). "Under North Carolina law, an authorized agent who enters into a contract on behalf of a disclosed principal generally is not personally liable to third parties for breach of contract since the contract is with the principal." Opsitnick v. Crumpler, No. 5:13-CV-835-D, 2014 WL 1682013, at *2 (E.D.N.C. Apr. 28, 2014) (unpublished) (alterations and quotation omitted); see Forbes Homes, Inc. v. Trimpi, 318 N.C. 473, 479–80, 349 S.E.2d 852, 856 (1986); Baker v. Rushing, 104 N.C. App. 240, 248, 409 S.E.2d 108, 112 (1991).

The Johnsons' lease agreement was between the Johnsons as tenants and AMCC as the owner. AMCC Property Management, the authorized agent listed in the contract, "is not personally liable to third parties for breach of contract since the contract is with the principal." Opsitnick, 2014 WL 1682013, at *2. The Johnsons do "not contest the determination that their breach of contract claim may not be asserted as to any defendant other than the signatory." [D.E. 34] 10. Accordingly, the court dismisses the Johnsons' breach of contract claim against all remaining defendants except

32

AMCC. <u>See</u> <u>Burn</u>, 2021 WL 4164685, at *9–10; <u>Page</u>, 2021 WL 4163562, at *10–11.

**V.**

In sum, the court GRANTS IN PART and DENIES IN PART defendants' motion to dismiss [D.E. 12]. The court DISMISSES WITHOUT PREJUDICE Lendlease Holdings, AMCC Managing Member, Winn Management Company, Winn Management Group, and WR South as defendants for lack of personal jurisdiction under Rule 12(b)(2). The court DENIES WITHOUT PREJUDICE defendants' motion to dismiss under Rule 12(b)(1). The court DISMISSES WITH PREJUDICE plaintiffs' breach of contract claim against Lendlease and AMCC Property Management under Rule 12(b)(6) for failure to state a claim. The court DENIES defendants' motion to dismiss on all other grounds.

SO ORDERED. This _5_ day of July, 2022.

JAMES C. DEVER III
United States District Judge

33
